HAMILTON, Senior Circuit Judge,
dissenting:
Because Chesapeake Bay did not receive anything close to a fair trial in this case, I respectfully dissent. I agree with the ma *537 jority that the district court erred in holding that West’s expert rebuttal testimony, to the effect that he found physical evidence of a thermal cut-out on the remains of the fan, was excepted from the dictates of Federal Rule of Civil Procedure (Rule) 26(a)(2)(B) and (e)(1). However, I disagree with the majority’s holding that the admission of such testimony constituted harmless error, and thus, was not subject to exclusion pursuant to Rule 37(c)(1). I also disagree with the majority’s holding that GNI’s two-step theory of causation, presented at trial, was sufficiently disclosed in West’s expert report, such that the district court did not abuse its discretion in allowing West to testify to the theory at trial. For these reasons, I would vacate the judgment and remand for a new trial with the condition that, prior to trial, Chesapeake Bay be allowed to conduct further discovery regarding the evidence challenged in this appeal, in accordance with Rule 26.
I.
As part of its rebuttal case, GNI recalled West to give expert opinion testimony on the question of whether the physical remains of the fan contained evidence of a thermal cut-out. In relevant part, the transcript reveals the following exchange between counsel for GNI and West during West’s direct testimony in rebuttal:
BY MR. ABEL:
Q Sir, you have had occasion to take a close look at the remains of the fan that is exhibit 63, right?
A Yes, sir.
Q Sir, is there anything there that leads you to believe that there was a thermal cut-out on that fan?
A Yes, sir.
Q Can you tell us what that is?
[A] Crimp right here on this wire. That is consistent with how a thermal protector would be installed.
Q Is there anything else on there on any other wire also consistent with having been a thermal cut-out ought [sic] there?
[A] You can see where a switch was installed. This is a switch. There is some other wires somewhere. But this part of it is one side of a thermal cut-off.
Q Have you seen that sort of thing before?
A Yes, sir.
(J.A. 338-40).
Because expert testimony has the potential to “be both powerful and quite misleading,” Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (internal quotation marks omitted), basic due process demands that expert testimony be subject to “[vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.” Id. at 596 (internal quotation marks omitted). Because GNI violated Rule 26(a)(2)(B) and (e)(1), Chesapeake Bay was prevented from subjecting the above quoted expert testimony to vigorous cross examination and prevented from presenting contrary evidence at trial.
With all due respect, the majority’s assertions to the contrary do not withstand scrutiny. What the majority characterizes as Chesapeake Bay’s declined opportunities to cure the effect of its surprise *538 amount to nothing. Such alleged declined opportunities include: (1) Chesapeake Bay’s opportunity to submit Dr. Richard Martin’s (Dr. Martin) deposition testimony that his pretrial examination of the fan debris did not reveal a thermal cut-out or any other switching elements or something as a separate thermal cut-out; (2) Chesapeake Bay’s opportunity to recall its own expert William Harris (Harris) in surrebuttal to reiterate his previous testimony that there is nothing in the fan remains to indicate that the fan ever had a thermal cut-out; and (3) Chesapeake Bay’s opportunity to sua sponte request a continuance or extended recess in order to afford it the opportunity to cure its surprise through further discovery.
With respect to the first two of these three alleged declined opportunities, the testimony of Dr. Martin and Harris is far too general to rebut West’s detailed and specific trial testimony, while apparently holding the burnt fan in his hands, that what led him to believe the fan had a thermal cut-out was the “crimp right here on this wire. That is consistent with how a thermal protector would be installed.” (J.A. 339). Moreover, without being armed with an expert witness opinion to rebut West’s very specific and detailed testimony regarding the physical evidence of a thermal cut-out, Chesapeake Bay lacked the ability to effectively cross examine West on this point. Indeed, “ ‘the ability to simply cross-examine an expert concerning a new opinion at trial is not the ability to cure, ... [as] the rules of expert disclosure are designed to allow an opponent to examine an expert opinion for flaws and to develop counter-testimony through that party’s own experts.’ ” Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 598 (4th Cir.2003).
Moreover, to put the burden on Chesapeake Bay, at the very end of a jury trial, to sua sponte request a continuance or extended recess in order to conduct further discovery and develop a credible response to expert testimony submitted in blatant violation of Rule 26(a)(2)(B) is unjustifiable. By placing such a burden on Chesapeake Bay, the majority sends the clear message that compliance with Rule 26(a)(2)(B) and (e)(1) is merely discretionary; indeed, only a nice idea, with no real consequences from noncompliance.
Considering (1) Chesapeake Bay’s lack of ability and opportunity to cure the prejudice of surprise that even the majority acknowledges Chesapeake Bay suffered when West testified during rebuttal regarding the physical evidence of the existence of a thermal cut-out on the fan, (2) the undisputed importance of such testimony in that it completely undercut Chesapeake Bay’s sole theory of causation, and (3) the pitiful excuse offered by GNI for failing to comply with Rule 26(a)(2)(B) and (e)(1), the conclusion is inescapable that the district court abused its discretion in overruling Chesapeake Bay’s objection to West’s rebuttal testimony regarding physical evidence of a thermal cut-out on the fan. Accordingly, at a minimum, I would vacate the judgment and remand for a new trial, with the condition that, Chesapeake Bay be allowed to conduct further discovery on the matter prior to such new trial.
II.
On appeal, Chesapeake Bay also challenges the district court’s admission of West’s direct testimony setting forth his two-step theory of causation. On direct examination, West was asked if he had a professional opinion as to when, in the time line, the fan had its motor burn up? West answered: “On initial hook up of the shore power.” (J.A. 282). West was then *539 asked, if he could “tell the jury why it is that if the motor fan burned up when the shore power was initially hooked up, the fire didn’t occur until five days later?” Id. West responded:
Because when they initially had it operating improperly when they initially did the connection, the wrong connection, the high voltage, they burned up the fan. They opened it up. So the captain wasn’t going to see anything running, because the fan wasn’t working, because it was open. But when they hooked up the ground to it and they started arcing on it, they gave potential there, difference of potential for the fan to start receiving a signal and heating up again.
(J.A. 282-83). In his next answer, West explained that the arcing resulted from voltage spikes caused by the welding work on the ship.
Chesapeake Bay argued below, and continues to argue on appeal, that West’s two-step theory of causation (ie., (step one) initial burnup of the fan’s motor, which made possible (step two) the subsequent fire originating from the fan five days later following an hour after the welding work) should have been excluded pursuant to Rule 37(c)(1) and the district court’s January 8, 2003 order granting Chesapeake Bay’s motion in limine to the extent that such motion sought to limit West’s expert testimony at trial “to what was disclosed in his expert report of October 25, 2002.... ” (J.A. 54). According to Chesapeake Bay, West’s two-step theory of causation was not set forth in his expert report of October 25, 2002. Chesapeake asserts that West’s report can only reasonably be read to opine that the fan caught fire solely because a “change in ARC’s by the welder” created voltage spikes in the fan. (J.A. 651).
The majority glosses over the crux of Chesapeake Bay’s argument by merely concluding that it agrees “with the district court’s finding that West’s report did provide notice that voltage spiking would be an issue at trial, although it could have been more clearly delineated.” Ante at 535-36. Notice that voltage spiking would be an issue at trial is hardly the point. No one disputes that West’s report identified voltage spiking as a critical part of his theory of causation. Significantly, however, the report, when read in a straightforward manner, opines that the fan was ignited by a voltage spike caused by a “change in ARC’s by the welder.” (J.A. 651) (“The change in ARC’s by the welder provided voltage spikes throughout [the] ship[’]s electrical circuits and approximately 1 hour later the fire was found.”). The critical point the majority fails to address is whether West’s expert report disclosed his opinion, admitted as evidence at trial, that the initial hook up of shore power and the ship’s exposure to the high leg instantly caused damage to the fan’s motor through voltage spikes, such that the subsequent voltage spikes from the welding work were able to cause the fan to ignite.
The answer to this question is clearly no. Indeed, when West was asked dining his deposition, taken just two weeks before trial, whether, anywhere in his report, he “explicitly sa[id]” that he thought “the coils of the fan were burned out by a voltage spike when the high leg was hooked up ... ?”, West answered, “Nowhere in this report, no.” (J.A. 615). West admitted during cross examination at trial that this was indeed his deposition testimony. (J.A. 294). In a case where the expert witness himself admits that his own report does not explicitly express a critical part of the very causation theory that he espouses at trial, that Chesapeake Bay cannot reasonably be expected to have leapt such an informational chasm is axiomatic. Accordingly, I would hold that the *540 district court erred in overruling Chesapeake Bay’s timely objection to the admission of West’s two-step theory of causation during his direct testimony, and would remand for a new trial with the condition that Chesapeake Bay, at a minimum, be allowed to conduct further discovery on the matter prior to such new trial.
III.
In conclusion, I am constrained to express that the majoritys affirmance in this case not only creates unfair consequences for Chesapeake Bay, it significantly weakens, if not obliterates, our civil discovery process and the intended bite of Rule 37(c)(l)’s exclusionary rule. GNI blatantly did not play by the discovery rules with regard to the expert testimony of West, and yet, suffered no adverse consequences. Indeed, GNI was able to use the effects of its own discovery violations to its very own significant tactical advantage. This court should not be in the business of readily countenancing such behavior. Accordingly, with the conditions which I have already set forth, I would vacate the judgment and remand for a new trial.